HATTIE HOWARD BOWMAN AND HUSBAND v. WEST HOWARD AND WIFE.

(Filed 14 December, 1921.)

**1. Partition—Pleadings—Ejectment—Court's Discretion.**

The plea of sole seizin in proceedings to partition lands converts them into an action of ejectment; and where the pleadings have become complicated and involved it is within the discretion of the trial judge to order the filing of new pleadings to present the clear-cut issue, as such does not change the cause of action.

**2. Pleadings—Amendments—Court's Discretion—Exceptions—Appeal and Error.**

Exceptions to the pleadings in partition proceedings as to sufficiency of allegations, etc., cannot be sustained on appeal when it appears that upon the plea of sole seizin the court has ordered new pleadings to be filed that have presented the clear-cut issue upon the evidence introduced at the trial.

**3. Evidence—Declarations—Ante Litem Motam—Adverse Possession—Limitation of Actions—Appeal and Error—Harmless Error.**

Where it is claimed that the former owner of lands, under whom a party claims by descent, has acquired title by adverse possession, it is competent to show, as substantive evidence, by a witness owning adjoining lands that *ante litem motam* his grantor staked out a corner therein for the purposes of a survey, which the ancestor of the party acknowledged to be the true line; and the further statement that the ancestor showed the witness the "common corner" is *held* too indefinite to be material, under the facts of this case.

**4. Descent and Distribution—Illegitimates—Slaves—Marriage—Evidence —Hearsay Evidence—Traditions.**

Where one claims lands of his father by descent by reason of the subsequent marriage of his parents, the child so born is recognized as legitimate for the purpose of inheriting, and this may be shown by evidence of the declarations of the parents, or by family traditions *ante litem motam*, this being an exception to the rule excluding hearsay evidence. C. S., 279, 2417.

**5. Evidence — Adverse Possession — Boundaries — Declarations — Ante Litem Motam.**

Where the title of a party to the action depends upon her legitimacy under a subsequent marriage of her parents, with evidence of family traditions to that effect, the words "reputed father," used in the statute, are construed to mean "considered, or generally supposed, or accepted by general or public opinion" to be such, and an exception claiming that they should be construed to mean "actual father" is without merit.

**6. Constitutional Law—Statutes—Descent and Distribution—Illegitimates —Marriage.**

Only those who would inherit, or have a vested right in the lands, may contest the constitutionality of C. S., 279, providing that a child born out of wedlock may inherit from her father who thereafter married the mother of the bastard.

BOWMAN *v.* HOWARD.

**7. Trials—Misconduct of Juror—Courts—Discretion—Appeal and Error.**

> Where, without the knowledge of either the court or the attorneys for the parties, a jury, after taking the case, views the land to which the title is in dispute, and the attorneys are informed of the fact about four hours before the verdict was rendered, and have not called the fact to the attention of the judge, it is in his discretion to set aside the verdict for the misconduct of the jurors, and his action in not so doing is not reviewable on appeal.

STACY, J., dissenting.

APPEAL by defendant from *Ray, J.,* at the March Term, 1921, of SCOTLAND.

The plaintiff, Hattie Bowman, instituted before the clerk two proceedings for a sale for partition of the lot in controversy. In February, 1916, Lizzie Howard London conveyed to West Howard a deed for said lot, and on the day following West Howard reconveyed a portion of said lot to his mother, Lizzie Howard London. In one of these proceedings West Howard was defendant, and in the other Lizzie Howard London was defendant. Lizzie died intestate in June, 1920, leaving West Howard as her only heir at law, and he was made party defendant in the proceeding originally instituted against her. Upon a plea of sole seizin, the cases were transferred to the civil docket, and when called for trial were consolidated. The issues and the answers thereto are as follows:

"1. Was Charlie Howard, at the time of his death, the owner and seized in fee simple and in possession of the lands described in paragraph one of the petition and amended complaint? Answer: 'Yes.'

"2. Is the plaintiff, Hattie Howard Bowman, the sole heir at law of Charlie Howard, deceased? Answer: 'Yes.'

"3. Is the plaintiff, Hattie Howard Bowman, the owner and entitled to the immediate possession of the lands described in paragraph one of the petition and amended complaint? Answer: 'Yes.' "

After judgment, the defendant having entered exceptions of record, appealed.

*G. T. Goodwyn and Russell & Weatherspoon for plaintiff.*
*Cox & Dunn for defendant.*

ADAMS, J. The plaintiff instituted two proceedings for a sale of land for partition. In each petition she alleged that Charlie Howard died intestate in January, 1916, seized and possessed of the lot in controversy, leaving surviving him as his only heirs at law two daughters, the plaintiff and Lizzie Howard London, the defendant's mother, and that the plaintiff and the defendant were tenants in common and entitled each

to a one-half undivided interest. The defendant denied the material allegations, alleged that at the time of her death Lizzie held the title in fee, and that the defendant was sole seized. The cases were thereupon transferred to the civil docket, and when they were called for trial the court granted the plaintiff leave to reply. In each case the plaintiff filed a replication, which, in effect, contradicted her former allegation that she and Lizzie were cotenants, and admitted, as the defendant alleged, that Lizzie was not an heir of Charlie Howard. When the replications were filed, the defendant asked leave to amend his answer so as to allege that he was, and the plaintiff was not, Charlie Howard's heir at law. The motion was disallowed, and the defendant excepted. The defendant then moved for leave "to reply to the replies," and excepted to the court's denial of the motion. The next recourse of the defendant—a demurrer *ore tenus* to the replies—the court held to be unavailing, and again exception was duly entered.

In "A Treatise on the Principles of Pleading," page 135, Stephen says: "On the whole, therefore, the author conceives the chief objects of pleading to be these: that the parties be brought to an issue, and that the issue so produced be material, single, and certain in its quality. In addition to these, however, the system of pleading has always pursued those general objects also, which every enlightened plan of judicature professes to regard: the avoidance of obscurity and confusion, of prolixity, and delay." Regard for this familiar principle no doubt moved his Honor to strike out the replications, and to make an order allowing the plaintiff to file a complaint with the usual allegations in ejectment, and allowing the defendant to file an answer thereto. To this order, also, the defendant excepted; but the court properly resolved to clear away the confusion produced by the inconsistent pleadings. The court, it will be noted, did not change the cause of action. The plea of sole seizin had already converted the proceeding into an action of ejectment (*Sipe v. Herman,* 161 N. C., 108), and the obvious purpose of the judge was "to bring the parties to an issue." The amended pleadings afforded ample opportunity to safeguard every right these exceptions were intended to preserve. For this reason exceptions 1, 2, 3, and 22 to 25, inclusive, are overruled.

The fourth exception was taken to his Honor's conclusion that in the defendant's original answers there was not sufficient allegation that Lizzie Howard London, mother of the defendant, was an heir at law of Charlie Howard. This ruling was made, however, before the amended pleadings were filed, and was not intended to apply, and by its terms did not apply, to the complaint and answer upon which the consolidated cases were tried. The evidence tended to show that Lizzie was born in Virginia some time before her mother came to North Carolina, and, of

course, before she made the acquaintance of Charlie Howard. Indeed, after the amended pleadings were filed the defendant's chief purpose seems to have been to show that the plaintiff was not the heir of Charlie Howard; and the trend of the defendant's evidence and the charge of the court indicate that the defense was based almost entirely on this theory. We are therefore satisfied that in the respect referred to the defendant was not materially prejudiced, and that the fourth exception cannot be sustained.

Exceptions 5 to 12, inclusive, impute error to the admission of D. A. Smith's testimony concerning the boundaries of the lot, up to which Charlie Howard claimed title. The beginning corner of the lot in controversy was "at an iron stake, Duncan Smith's corner." The witness testified that he was the Smith referred to, and knew the location of this corner; that at the time he purchased from McLaurin his land was surveyed; and McLaurin at that time "put down" the corner in controversy as a corner of the land sold to the witness.

Charlie Howard had no paper title. The plaintiff relied upon Howard's alleged adverse possession, and it was particularly important for her to show the "known and visible lines and boundaries" of the lot. The evidence excepted to was competent. Evidence that McLaurin had "put down" the corner was substantive, not hearsay; but if it can be construed as a declaration tending to locate his own land it was contemporaneous with the survey (*Cherry v. Slade*, 7 N. C., 86); and if as a declaration concerning the corner of an adjoining lot, it was likewise admissible. *Mason v. McCormick*, 85 N. C., 226; *Fry v. Currie*, 91 N. C., 439. Also, the statement of the witness that Charlie Howard showed him the "common corner" is entirely too indefinite to constitute reversible error.

Exceptions 13 to 20, inclusive, assail the admissibility of Charlie's and Celie's declarations concerning the paternity of Hattie. There was evidence for the plaintiff which tended to show that Celie and Lizzie, her older daughter, were brought from Virginia to Rockingham in 1862; that after the custom of slaves Celie intermarried with Charlie Howard a few years afterward, and that Hattie was born after the marriage. C. S., 2497; *Bettis v. Avery*, 140 N. C., 187; *Erwin v. Bailey*, 123 N. C., 628; *Long v. Barnes*, 87 N. C., 330. If the jury should accept this evidence, the declarations, made *ante litem motam* by the alleged father and mother, who have since died, were admissible without regard to C. S., 279. Family tradition or pedigree is a recognized exception to the rule which generally excludes hearsay evidence. *Hodges v. Hodges*, 106 N. C., 374; *Rollins v. Wicker*, 154 N. C., 560; *Turner v. Battle*, 175 N. C., 219; *Moffitt v. Witherspoon*, 32 N. C., 186.

In answer to the question whether he knew the reputed father of Hattie, a witness was permitted to testify over the defendant's objection that he knew her as Charlie Howard's daughter. C. S., 279, is as follows: "When the mother of any bastard child and the reputed father of such child shall intermarry or shall have intermarried at any time after the birth of such child, the child shall in all respects after such intermarriage be deemed and held to be legitimate, and is entitled to all the rights in and to the estate, real and personal, of its father and mother that it would have had had it been born in lawful wedlock."

In the case on appeal it is said: "No contention as to the statute was made by the defendant except as to the construction of the words 'reputed father,' which the defendant contended should be construed to mean 'actual father.'" The exception is not meritorious. The word "reputed" means considered, or generally supposed, or accepted by general or public opinion. 34 Cyc., 1625; Black's Law Dic., 1022; *Pav. Co. v. Lyons,* 43 Pac., 599. In *McBride v. Sullivan,* 155 Ala., 174, *Simpson, J.,* says: "The use of the word 'reputed' was intended merely to dispense with absolute proof of paternity, so that, if the child is 'regarded,' 'deemed,' 'considered,' or 'held in thought' by the parents themselves as their child, either before or after marriage, it is legitimate."

The issues were framed so as to present the various contentions of each party; and the theory upon which the defense was conducted indicates that the instruction to which the thirty-first exception was directed is not reversible error. Upon this theory his Honor's charge as to adverse possession also is approved. The first paragraph of the charge, construing C. S., 279, is free from error, and the second paragraph is sustained by the authorities. *McBride v. Sullivan,* 155 Ala., *supra;* 22 C. J., 239; *Kelly v. McGuire,* 15 Ark., 555. If the brothers or sisters of Charlie Howard bring suit to recover the land, the constitutionality of section 279 may be put to the test, but upon the evidence in this case and the theory of the defense we are at a loss to see how the defendant can invoke the doctrine of vested rights.

The forty-fifth exception is to the refusal of the court to set aside the verdict for alleged misconduct of the jury. Charlie Howard claimed to have had possession of the land for more than twenty years under known and visible lines and boundaries. The court found these to be the facts: Without permission of the court or the consent of counsel, the jury went near the property, and one or two of the jurors walked into the yard, and were told by a woman who was there how far back the lot extended. She said nothing about possession. The jury returned to the courthouse about nine o'clock, and before the court convened the officer in charge remarked in the presence of counsel for each party that the jury had gone over the lot. Approximately four hours elapsed

before the verdict was returned, during which counsel had ample time and opportunity to investigate the facts. The court held that the conduct of the jury might have been prejudicial to the defendant, but that the defendant's counsel remained silent when they should have spoken, and denied the motion.

Not infrequently a new trial is granted when jurors, without the authority of the court or consent of the parties, have examined or inspected a place or thing which is the subject of conflicting evidence, but ordinarily the disposition of matters of this kind is within the sound discretion of the court. When the question relates to a juror's misconduct, it is generally within the discretion of the presiding judge to refuse to grant a new trial, if he is satisfied that the verdict should not be set aside. *Harrington v. R. R.,* 157 Mass., 582; *Bank v. Burns,* 120 N. W. R., 626; *S. v. Tilghman,* 33 N. C., 513; *Willeford v. Bailey,* 132 N. C., 408; *S. v. Boggan,* 133 N. C., 766; *S. v. McKenzie,* 166 N. C., 296.

We have considered all the exceptions relied on, and find no sufficient cause for disturbing the verdict.

No error.

STACY, J., dissenting in part: I think the forty-fifth exception, or the one directed to his Honor's refusal to hear and consider the defendants' motion for a new trial, based upon the alleged misconduct of the jury, is fatal, and should be held for reversible error. I have no desire to controvert the well settled principle that ordinarily the disposition of such matters is reposed in the sound discretion of the trial court; but, to my mind, the instant case does not come within the rule stated. The exception presents a legal rather than a discretionary ruling, and it comes to us as a question of law; otherwise I should be content.

This proceeding was instituted upon a petition for partition, and subsequently converted into an action of ejection. After the issues had been given to the jury for their consideration, they were permitted to go upon the lands and to view the *locus in quo.* This was done without permission of the court or consent of counsel. "One or two of the jurors went into the yard and asked a woman how far the lands went back, and she informed them that the land went back to the fence on one side and to the hog-pen on the other. The lands had been recently plowed, and they were in clear view from the position the jury occupied."

The officer in charge of the jury remarked in the presence of counsel for the defendants that the jury, while out walking, had gone over the lands in controversy, but he said nothing about their having talked to the woman in the yard. This remark was made on Friday morning, just before the opening of court, approximately four hours before the

jury returned its verdict, and was not called to the attention of the judge until after the verdict had been received. During the major portion of this time, however, it should be said, counsel for defendants, as well as the court, were engaged in the trial of another cause. I now quote from the record:

"Upon the foregoing finding of facts the court was of the opinion that the aforesaid conduct of the jury might have been prejudicial to the defendants and their cause, but refused and declined to set aside the verdict for reasons stated by the court as follows:

" 'That both of counsel for defendant remained quiet when the court finds that they should and could have been diligent and called the court's attention to the matter, and having failed to call the court's attention to the matter and waiting until the jury had returned their verdict, and having failed to make their motion for a mistrial in apt time, the court concludes, and so finds, that they are now estopped to impeach the verdict of the jury upon the facts presented to and as found by the court, and the motion is denied.' "

It should be remembered that the most hurtful part of the conduct of the jury, to wit, the conversation they had with the woman on the place, was not known to counsel prior to the rendition of the verdict. This fact seems to have been overlooked by his Honor below, and herein lies the error. It will be readily conceded that if the matter were subject to correction, and had been known, and counsel remained silent when it was their duty to speak, they ought not to be heard now. But if the defendants were entitled to a *venire de novo,* as a matter of right, why should their motion be denied simply because it is made for a new trial rather than for a mistrial? *S. v. Miller,* 18 N. C., 500. These subtle distinctions and technicalities were considered material at the common law, but not so with us under the Code of Civil Procedure. To deny a legal right merely for the observance of form is to forsake the substance for the shadow. Indeed, this would be keeping the spirit of the new and more liberal practice to the ear and breaking it to the hope.

Speaking to this question in *S. v. Tilghman,* 33 N. C., 553, *Pearson, J.,* says: "We take this plain position: If the circumstances are such as merely puts suspicion on the verdict by showing, not that there was, but that there might have been undue influence brought to bear on the jury, because there was opportunity and a chance for it, it is a matter within the discretion of the presiding judge. But if the fact be that undue influence was brought to bear on the jury, as if they were fed at the charge of the prosecutor or the prisoner, or if they be solicited and advised how their verdict should be, *or if they have other evidence than that which was offered on the trial* (italics mine), in all such cases

there has, in contemplation of law, been no trial; and this Court, as a matter of law, will direct a trial to be had."

Time forbids a more extended investigation, but the foregoing will suffice to indicate the outline and basis for the reasons which constrain me to dissent from the otherwise clear and forceful opinion of the Court.